QUINN EMANUEL URQUHART &
SULLIVAN, LLP
John B. Quinn (No. 90378)
Kristen Bird (No. 192863)
B. Dylan Proctor (No. 219354)
Ryan Landes (No. 252642)
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Email: johnquinn@quinnemanuel.com
Email: kristenbird@quinnemanuel.com
Email: dylanproctor@quinnemanuel.com

FENNEMORE CRAIG, P.C.
Amy Abdo (No. 016346)
Brett C. Gilmore (No. 034598)
Lyndsey Maasch (No. 035548)
2394 E. Camelback Road, Ste. 600
Phoenix, Arizona 85016
Telephone: (602) 916-5000
Email: amy@fennemorelaw.com
Email: bgilmore@fennemorelaw.com
Email: lmaasch@fennemorelaw.com

*Attorneys for Plaintiff Pima Heart
Physicians, P.C.*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

## TUCSON DIVISION

| | |
|---|---|
| PIMA HEART PHYSICIANS, P.C., an Arizona professional corporation,<br><br>Plaintiffs,<br><br>v.<br><br>SONORAN VEIN AND ENDOVASCULAR, LLC, an Arizona limited liability company; LUIS R. LEON, JR., an individual; HEATHER BAILEY, an individual,<br><br>Defendant. | Case No. CV-24-00606-TUC-RM<br><br>**PLAINTIFF PIMA HEART'S MOTION FOR TEMPORARY RESTRAINING ORDER, EXPEDITED DISCOVERY, AND ORDER TO SHOW CASE FOR PRELIMINARY INJUNCTION**<br><br>*Oral Argument Requested* |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................. 1

FACTUAL BACKGROUND ................................................. 2

      A.    Pima Heart's Business ................................................. 2

      B.    USHV's Acquisition Of Pima Heart ................................ 3

      C.    Defendants' Contractual Obligations To Pima Heart .................. 4

      D.    Defendants' Scheme to Compete Against Pima Heart and Steal Trade Secrets ................................................. 6

      E.    Defendants Join Pima Heart's Competitor Sonoran Vein and Lie About It ................................................. 7

ARGUMENT ................................................. 9

    I.    PIMA HEART IS LIKELY TO SUCCEED ON THE MERITS ......... 9

      A.    Pima Heart Is Likely To Succeed On Its Trade Secrets Claim ........ 9

      B.    Pima Heart Is Likely To Succeed On Its Contract Claims ........... 12

      C.    Pima Heart Is Likely To Succeed On Its Breach Of Loyalty Claim ......... 17

      D.    Pima Heart Is Likely To Succeed On Its Tortious Interference Claim ................................................. 17

    II.    PIMA HEART IS BEING IRREPARABLY HARMED ................... 18

    III.    THE BALANCE OF HARDSHIPS SUPPORTS INJUNCTIVE RELIEF ......... 19

    IV.    PUBLIC INTERESTS SUPPORT INJUNCTIVE RELIEF ................. 20

    V.    PIMA HEART SHOULD NOT BE REQUIRED TO POST ANY BOND ........ 21

    VI.    THE COURT SHOULD PERMIT EXPEDITED DISCOVERY ........ 21

CONCLUSION ................................................. 21

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

1
2

### **TABLE OF AUTHORITIES**

**Page(s)**

3

### **Cases**

4

*Ajilon Pro. Staffing, LLC v. Griffin,*
   2009 WL 976522 (D. Ariz. Apr. 10, 2009) ........................................................... 18, 20

5
6

*Alto v. Salazar,*
   2011 U.S. Dist. LEXIS 114167 (S.D. Cal. Oct. 4, 2011) ........................................... 19

7
8

*Auto Now Fin. Servs. v. Abdeljaber,*
   2013 WL 12106927 (D. Ariz. May 23, 2013) .................................................. 10, 12, 19

9
10

*Bakemark USA LLC v. Pastis,*
   2024 WL 149727 (D. Ariz. Jan. 12, 2024) .................................................................. 21

11
12

*Bancroft-Whitney Co. v. Glen,*
   64 Cal. 2d 327 (1966) ................................................................................................. 17

13

*Bullock v. Ariz. Bd. of Regents,*
   2024 WL 4680575 (D. Ariz. Nov. 5, 2024) .................................................................. 9

14
15

*C21FC LLC v. NYC Vision Cap. Inc.,*
   2022 WL 2191934 (D. Ariz. June 17, 2022) ............................................................... 14

16
17

*Colwell Consulting LLC v. Papageorge,*
   2024 WL 3811677 (D. Ariz. Aug. 14, 2024) .......................................................... 9, 12

18
19

*Comet Techs. United States of Am. Inc. v. Beuerman,*
   2018 WL 1990226 (N.D. Cal. Mar. 15, 2018) ................................................. 11, 20, 21

20

*Compass Bank v. Hartley,*
   430 F. Supp. 2d 973 (D. Ariz. 2006) .................................................................... 18, 20

21
22

*Cont'l Promotion Grp., Inc. v. Garvin,*
   2008 WL 11338887 (D. Ariz. May 8, 2008) ......................................................... 13, 14

23
24

*Diazteca Co. v. Palenque Foods Int'l LLC,*
   2016 Ariz. Super. LEXIS 1509 (Pima Cnty. Super. Ct. Nov. 14, 2016).................... 16

25
26

*Dish Network L.L.C. v. Ramirez,*
   2016 WL 3092184 (N.D. Cal. June 2, 2016) .............................................................. 20

27

*Elko, Inc. v. WTH Commer. Servs., LLC,*
   2023 WL 6141623 (D. Nev. Sept. 20, 2023) .............................................................. 12

28

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

*Enter Leasing Co. v. Ehmke*,
    197 Ariz. 144 (Ct. App. 1999) ................................................................ 10, 20

*Fitness v. C.P. Body Design*,
    2010 WL 11628010 (D. Ariz. Feb. 24, 2010) ...................................... 18, 19

*Food Servs. of Am., Inc. v. Carrington*,
    2013 WL 4507593 (D. Ariz. Aug. 23, 2013)........................................ 10, 13

*Gann v. Morris*,
    122 Ariz. 517 (Ariz. Ct. App. 1979) .................................................... 13, 14

*Gordon Grado M.D., Inc. v. Phx. Cancer & Blood Disorder Treatment Inst.*
    *PLLC*,
    603 F. Supp. 3d 799 (D. Ariz. 2022) ........................................... 9, 10, 12

*Henry Schein, Inc. v. Cook*,
    191 F. Supp. 3d 1072 (N.D. Cal. 2016) ........................................ 9, 11, 19, 20

*Highway Techs., Inc. v. Porter*,
    2009 WL 1835114 (D. Ariz. June 26, 2009) ...................................... 16, 19

*Howard v. United States*,
    448 F. App'x 752 (9th Cir. 2011) ................................................................ 15

*Jorgensen v. Cassiday*,
    320 F.3d 906 (9th Cir. 2003) ...................................................................... 21

*Joshua David Mellberg LLC v. Will*,
    2016 U.S. Dist. LEXIS 32414 (D. Ariz. Mar. 11, 2016)............................ 11

*JTH Tax LLC v. Anderson*,
    2023 WL 3499645 (D. Ariz. Apr. 18, 2023) ...................................... 11, 12

*Lassen v. Benton*,
    86 Ariz. 323, *modified on reh'g*, 87 Ariz. 72 (Ariz. 1959)................... 15, 16

*NCWC Inc. v. CarGuard Admin. Inc.*,
    635 F. Supp. 3d 815 (D. Ariz. 2022) ......................................................... 18

*Paul Johnson Drywall Inc. v. Sterling Grp., LP*,
    2021 WL 5882628 (D. Ariz. Dec. 13, 2021) ...................................... 12, 19

*PepsiCo, Inc. v. Redmond*,
    54 F.3d 1262 (7th Cir. 1995) ...................................................................... 11

*Physical Excellence v. Dow*,
    2006 WL 8441227 (D. Ariz. Mar. 6, 2006) ................................................................ 16

*Sec. Title Agency, Inc. v. Pope*,
    219 Ariz. 480 (App. 2008) .......................................................................................... 17

*Solar Optimum Inc. v. Elevation Solar LLC*,
    2024 WL 1961858 (D. Ariz. May 3, 2024) ................................................................ 17

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*,
    240 F.3d 832 (9th Cir. 2001) ....................................................................................... 9

*Ternlund v. Medical Anesthesia Consultants Med. Group*,
    2021 Cal. Super. LEXIS 153961 (San Francisco Super. Ct. June 29, 2021) ............. 14

*Ticor Title Ins. Co. v. Cohen*,
    173 F.3d 63 (2d Cir. 1999) ......................................................................................... 19

*Tracer Research Corp. v. Nat'l Envtl. Serv. Co.*,
    843 F. Supp. 568 (D. Ariz. 1993) (Marquez, J.) ........................................................ 10

*Universal Servs. of Am. LP v. Mazzon*,
    2023 WL 4031965 (D. Ariz. June 15, 2023) .................................................. 16, 17, 18

*Valley Med. Specialists v. Farber*,
    194 Ariz. 363 (Ariz. Ct. App. 1999) ..................................................................... 14, 15

*W. Coast Cambridge, Inc. v. Rice*,
    584 S.E.2d 696 (Ga. App. 2003) ................................................................................ 14

*W.L. Gore & Assocs., Inc. v. GI Dynamics, Inc.*,
    2010 WL 5184254 (D. Ariz. Dec. 15, 2010) ............................................................. 10

*WeRide Corp. v. Huang*,
    379 F. Supp. 3d 834 (N.D. Cal. 2019) ....................................................................... 21

*Whinery v. Premier Funeral Mgmt. Grp. IV, LLC*,
    2022 WL 4473716 (W.D. Okla. Sep. 26, 2022) ........................................................ 15

## **Statutes**

18 U.S.C.A. § 1839(3) .................................................................................................... 9

Arizona Uniform Trade Secrets Act ............................................................................. 10

## **Rules**

Fed. R. Civ. P. 26(d) ..................................................................................................... 21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Fed. R. Civ. P. 65 ................................................................................................ 1

Fed. R. Civ. P. 65(c) ......................................................................................... 21

In accordance with Fed. R. Civ. P. 65, Plaintiff Pima Heart Physicians, P.C. ("Pima Heart") seeks a temporary restraining order (with notice), expedited discovery, and an order to show cause for preliminary injunction against all Defendants as set forth in the contemporaneously filed proposed form of order.[1]

## PRELIMINARY STATEMENT

Plaintiff Pima Heart is Southern Arizona's premier provider of cardiovascular care. Over the years, Pima Heart has developed and confidentially maintains patient data, financial analyses, and business and marketing strategies and standards that together serve as a blueprint for building a cardiovascular practice. Defendants—led by Dr. Luis Leon, who was bound by non-compete agreements that he accepted in exchange for millions of dollars in connection with the sale of Pima Heart's business—stole this material from Pima Heart and took it to competitor Sonoran Vein. Pima Heart needs injunctive relief to stop Defendants from competing in violation of their contractual obligations and common law duties, and from using the material they misappropriated from Pima Heart. Pima Heart is cognizant of the holiday timing and does not seek an overnight decision, but asks that the Court enter a briefing schedule requiring all issues raised by this Motion be fully briefed no later than Friday, January 10, 2024.

In the spring of 2024, while still employed by Pima Heart, Dr. Leon enlisted Physician Assistant and Director of Vascular Services, Jennifer Clark, and Office Manager of the Vascular Group and Registered Nurse, Heather Bailey, to coordinate their departures for a competitor. In the ensuing months, Ms. Bailey and Ms. Clark raided Pima Heart's trade secrets by downloading materials to external USB storage drives. Although they had no legitimate reason to do so, they copied patient lists reflecting Pima Heart's patients' contact information, needs and preferences, and treatment histories; profitability reports that contain Pima Heart's vendor pricing, overhead costs, and provider fees; and an extensive library of Pima Heart's protocols, checklists,

---

[1]    Consistent with Defendant Luis Leon's Employment Agreement, Pima Heart filed this action in the District of Arizona, Phoenix division, located within Maricopa County, where defendant Sonoran Vein also resides. *See* CV-24-03611-PHX-DJH (Humetewa, J.). The Phoenix court transferred the action to this division *sua sponte*. Pima Heart intends to move for a transfer back to the Phoenix division in due course, including based on the forum selection clause in the Employment Agreement.

documentation requirements, treatment plans, medical administration guides, recruiting and marketing strategies, post-treatment procedures, clinical guidelines and protocols, and other standard operating procedures.  Shortly thereafter, with Pima Heart's trade secrets in tow, the trio started working together at Sonoran Vein, in violation of Dr. Leon's non-compete agreement and Defendants' other obligations.  Sonoran Vein has been fully complicit in this scheme—it became aware of Dr. Leon's non-compete agreements by no later than August 2024, and has since attempted to invalidate them, unsuccessfully.  What is worse, Dr. Leon and Sonoran Vein have lied to Pima Heart and in judicial pleadings, claiming that Dr. Leon is not working at Sonoran Vein's locations in Pima County pending resolution of these disputes.  In fact, Pima Heart's investigator observed Dr. Leon's vehicles parked in the "physicians" area in the parking lot of Sonoran Vein's St. Mary's Location in Pima County *every time* he visited the location between December 2 and 19, 2024.  Defendants' willingness to lie about their actions underscores their improper motives.

Pima Heart needs prompt injunctive relief to protect its confidential and trade secret information that Defendants stole, and to protect the goodwill that Dr. Leon and Sonoran Vein are jeopardizing by their disregard for Dr. Leon's non-compete agreements.

## FACTUAL BACKGROUND

### A.    Pima Heart's Business

Pima Heart provides comprehensive cardiovascular care in Southern Arizona.  Its medical providers are leaders in their field.  A. Tuli Decl. ¶ 3; M. Varela Decl. ¶ 3.  Pima Heart's success is the result of the substantial time and resources devoted to building its patient base and goodwill, establishing vendor relationships, and developing a streamlined practice.  L. Andrews Decl. ¶ 33.

Pima Heart has developed and maintains several categories of confidential, trade secret medical and business information that support its practice.  For example, Pima Heart's patient lists identify Pima Heart's patients and their contact information, along with information about patients' needs, preferences, and treatment histories.  L. Andrews Decl. ¶ 22.  Pima Heart also maintains profitability reports that contain vendor pricing, overhead costs, and provider fees.  C. Andrews Decl. ¶¶ 5–6.  Pima Heart has also authored an extensive library of protocols,

checklists, documentation requirements, treatment plans, medical administration guides, recruiting and marketing strategies, post-treatment procedures, clinical guidelines and protocols, and other standard operating procedures. *Id.* ¶ 8.  These materials enable Pima Heart to efficiently deliver seamless, high-quality medical care.  *Id.* ¶ 9.  Pima Heart protects the confidentiality of this material in multiple ways, including confidentiality agreements and policies for Pima Heart employees and third parties, network and electronic security for Pima Heart's computers and other systems, and physical security for Pima Heart's offices.  *Id.*; L. Andrews Decl. ¶¶ 28-31; D. Koeppe Decl. ¶¶ 4-7.

### B.    USHV's Acquisition Of Pima Heart

In late 2021, ACOF VI USHV Holdings, L.P., which is a special-purpose affiliate of US Heart & Vascular, paid ██████████ (the "Transaction") to acquire Pima Heart. L. Andrews Decl. ¶ 4. The Transaction was documented in related agreements executed on or around December 5, 2021. *Id.* USHV allocated ██████████ of the purchase price to Pima Heart's goodwill. *Id.*

The primary Transaction document was a Membership Interest Purchase Agreement (the "MIPA"), which attached and/or referenced ancillary agreements including, as relevant here, physician-specific Transaction Bonus Agreements, Restricted Covenant Agreements, Amended and Restated Employment Agreements, and Restricted Unit Award Agreements. *Id.* All of these ancillary agreements were either executed concurrently with the MIPA or expressly conditioned on the Transaction closing. *Id.* All of these agreements were heavily negotiated and thoroughly disclosed to and discussed with Pima Heart's physicians, including Dr. Leon. A. Tuli Decl. ¶ 8.

At the time of the Transaction, Pima Heart's shareholders included only the cardiologists of the practice. L. Andrews Decl. ¶ 5. However, the vascular surgeons in Pima Heart's vascular surgery group ("Vascular Group"), including Dr. Leon, also played a critical role in building Pima Heart's reputation, goodwill, and profitability. *Id.* At the time of the Transaction, Ms. Bailey was the Office Manager of the Vascular Group and a Registered Nurse. *Id.* ¶ 17. Non-party Jennifer Clark was a Physician Assistant and the Director of Vascular Services at Pima Heart. C. Andrews Decl. ¶ 3; L. Andrews Decl. ¶ 14.

**C.    Defendants' Contractual Obligations To Pima Heart**

Pima Heart's reputation and doctor-patient relationships are the source of its success, and they are what USHV paid handsomely to acquire.  Because the goodwill and relationships of a medical practice depend almost entirely on the physicians, it was crucial for Pima Heart to retain its key physicians and patient relationships after the Transaction.  A. Tuli Decl. ¶ 7.  To that end, the parties and Pima Heart's physicians, including Dr. Leon, negotiated agreements preventing those physicians from competing against the post-Transaction Pima Heart or soliciting its customers and employees for a limited period of time (the "Restrictive Covenants").

In exchange for their commitments not to undermine the value of USHV's acquired property, the ▇▇▇▇▇ sale price was allocated among all of Pima Heart's physicians, including the shareholder cardiologists **and** the non-shareholder vascular surgeons, subject to each physician's acceptance of restrictive covenants.  L. Andrews Decl. ¶ 5.  Dr. Leon, as a leader in the Vascular Group, helped to determine how to allocate payments among his group, and he allocated himself over ▇▇▇▇▇, one of the largest individual payouts.  *Id.* ¶ 6.  The Restrictive Covenants to which Dr. Leon agreed in consideration of this payment are set forth in two agreements, described below.  *Id.* ¶¶ 9–10, Exs. C, D.  Ms. Clark also received a bonus of ▇▇▇▇▇ in the Transaction.  *Id.* ¶ 14.

**The Restrictive Covenants Agreement**.  Dr. Leon's Restrictive Covenant Agreement recites that the obligations therein are in consideration of the sale proceeds that Dr. Leon received in the Transaction.  *Id.* Ex. C at 1 & §7 ("In further consideration of the payments to be made by the Company Group to Physician at the Closing . . . .").  The Restrictive Covenant Agreement includes a non-compete provision that runs for five years post-Transaction, through December 2026, in the "Restricted Area," defined as Pima County.  It includes a step-down provision to "a 5 mile radius around each physical location that [Pima Heart] operates, including [Pima Heart's] headquarters, any ambulatory surgical center, laboratory or research facility."  *Id.* § 7.  This non-compete restriction contains exemptions for emergency medical services, holding privileges at hospitals within the restricted areas, and providing services to patients admitted to hospitals within the restricted areas.  *Id.* § 7(a).  In addition, the Restrictive Covenant Agreement includes:

-4-

a non-solicit provision, which restricts initiating or knowingly encouraging any employee or independent contractor to leave the employ of Pima Heart during the Restricted Period (*id.* § 7(b)(i)); a non-interference provision, which restricts interfering with Pima Heart's business relations (*id.* § 7(b)(iii)); and confidentiality provisions that prohibit the use or disclosure of Pima Heart's Confidential Information during and after employment (*id.* § 2).

**The Employment Agreement**. The Amended and Restated Employment Agreement (the "Employment Agreement") that Dr. Leon executed at the same time as the Restrictive Covenant Agreement contains a non-compete provision for a period of one year following the end of employment with Pima Heart. L. Andrews Decl. Ex. D § 8.1. It prohibits Dr. Leon from providing vascular surgery services, cardiology services, or related ancillary services within a five-mile radius of the top two Pima Heart medical office locations at which he practiced (the River Road and Green Valley locations). L. Andrews Decl. ¶ 19. It carves out emergency medical services, holding privileges at hospitals within the restricted areas, and providing services to patients admitted to hospitals within the restricted areas. L. Andrews Decl. Ex. D § 8.1. The Employment Agreement also contains non-solicitation, non-interference, and confidentiality obligations similar to the Restrictive Covenant Agreement. *Id.* §§ 7.2, 8.2. By signing the agreement, Dr. Leon acknowledged that all confidential information "constitutes proprietary information and trade secrets of [Pima Heart]" and Pima Heart is entitled to injunctive relief to protect its "legitimate trade secrets and business interests." *Id.* §§ 7.2, 7.4. Further, he acknowledged that he would act "in accordance with . . . [Pima Heart's] governing documents and all applicable written policies, procedures, rules and regulations of [Pima Heart]." *Id.* § 3.3.

**Confidentiality Agreements**. In the ordinary course of their employment, Dr. Leon, Ms. Clark, and Ms. Bailey also each agreed to comply with Pima Heart's written policies, standards, and regulations, including those related to the protection of confidential information. L. Andrews Decl. Ex. D, § 3.3; L. Andrews Decl. ¶ 29 Exs. J-K. Pima Heart's Employee Handbook, for example, provides that ███████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ L. Andrews Decl. Ex. J p. 23.

Other Pima Heart policies and procedures require the same. *See id.* Ex L (agreement to "only discuss health information on a 'need-to-know' basis with employees"; "not make any inquiries or attempt to access any health information (whether through files, computers, telephones, etc.) beyond that which involves my work and where I have a 'need to know'"; "not disclose any such sensitive information to any persons outside the company and will limit my discussions inside the company to those who have a 'need-to-know'"); D. Koeppe Decl. Exs. A & B ("[A]ll employees must take measures to protect these assets from unauthorized use, theft, misuse, accidental or unauthorized modification, disclosure, transfer, or destruction.").

### D.    Defendants' Scheme to Compete Against Pima Heart and Steal Trade Secrets

In early 2024, Dr. Leon and Ms. Clark began threatening to end their employment if Pima Heart would not accede to unworkable demands, including a release from Dr. Leon's Restrictive Covenants. L. Andrews Decl. ¶ 14.  On May 7, 2024, Pima Heart gave advance written notice to Dr. Leon and Ms. Clark that it was terminating their employment, effective August 5, 2024. L. Andrews Decl. ¶ 16.  As part of these employees' exit process, Pima Heart reminded them of their ongoing confidentiality and other obligations. *Id.*  ¶ 31.

But as Pima Heart only recently learned, ***before*** receiving the advance notice of termination in May, Dr. Leon and Ms. Clark had already embarked on a scheme to compete against Pima Heart and steal its trade secrets.  As early as April 22, 2024, Dr. Leon and Ms. Clark had entered into non-disclosure agreements with Banner Health and were discussing the prospect of leading Pima Heart's entire Vascular Group to join that competitor.  L. Andrews Decl. ¶ Ex. G.

After receiving the advance notice of their termination from Pima Heart, but while still employed at Pima Heart, Dr. Leon and Ms. Clark successfully solicited Ms. Bailey—in violation of Dr. Leon's non-solicit obligations—to leave Pima Heart and join them at a new competing venture.  Prior to Dr. Leon's last day, Ms. Bailey informed Pima Heart that she, too, would be terminating her employment, supposedly because she intended to turn her part-time teaching role at the University of Arizona into a full-time position.  L. Andrews Decl. ¶ 17.  That was not true; Pima Heart later found Ms. Bailey listed on Sonoran Vein's website.  L. Andrews Decl. ¶ 37.

While they were still at Pima Heart, Dr. Leon and Ms. Clark also attempted to redirect Pima Heart's prospective business to their new employer. In May 2020, Pima Heart was in the final stages of negotiations to provide vascular services for the Tohono O'odham Nation ("Tohono"). L. Andrews Decl. ¶ 26. On May 20, 2024, Ms. Clark emailed Tohono, copying Dr. Leon, announcing that she and Dr. Leon intended to depart from Pima Heart, and inviting Tohono to hire them at their new employer. L. Andrews Decl. ¶ 22 & Ex. H.

Dr. Leon, Ms. Bailey, and Ms. Clark did not leave for Sonoran Vein empty-handed. On June 12, 2024, Ms. Bailey inserted an external USB storage device into her Pima Heart computer and created multiple folders on the USB drive corresponding to entire categories of Pima Heart confidential information, such as "Clinical Trials"; the forensic artifacts indicate that Ms. Bailey was copying folders *en masse*. R. Johnson Decl. ¶¶ 10-11. She engaged in similar activities on September 27, 2024—her last day at Pima Heart. *Id.* ¶ 12. On July 16, 2024, Ms. Bailey accessed and printed reports containing comprehensive information on all patients seen by Ms. Clark and Dr. Leon in 2023. L. Andrews Decl. ¶¶ 22-23. Ms. Bailey appears to have taken a collection of Pima Heart files that a competitor could use to jumpstart a new business. C. Andrews Decl. ¶¶ 4, 5, 15. Ms. Clark took material too. On June 12, 2024 (the same day Ms. Bailey was copying Pima Heart's files), Ms. Clark put an external USB storage drive into her Pima Heart computer, and—just like Ms. Bailey—created multiple folders on the drive indicative of copying Pima Heart's material. R. Johnson Decl. ¶ 15. She did this on July 11, 2024 as well, just days before Ms. Bailey did the same thing on July 16. *See id.* ¶¶ 10, 16; *see also* C. Andrews Decl. ¶ 4.

Between Ms. Bailey and Ms. Clark, they took materials related to virtually ***the entire operation*** of Pima Heart's Vein Center. C. Andrews Decl. ¶¶ 4, 15. There is no legitimate business or medical purpose for them to have copied this material at all, much less to do so secretly just before leaving. The only logical explanation is that they intended to take it with them and disseminate to Dr. Leon to use for his own and Sonoran Vein's benefit.

**E.   Defendants Join Pima Heart's Competitor Sonoran Vein and Lie About It**

Three weeks after Dr. Leon and Ms. Clark departed Pima Heart, on August 30, 2024, Sonoran Vein informed Pima Heart that Dr. Leon wanted to work at Sonoran Vein's not-yet-open

1    locations in Pima and Cochise Counties.  L. Andrews Decl. ¶ 16.  Sonoran Vein argued that Dr.

2    Leon's Restrictive Covenants were unenforceable.  *Id.* Ex. E.  On September 13, 2024, Pima

3    Heart responded, reiterating that Dr. Leon's Restrictive Covenant obligations were enforceable,

4    but offering to discuss the matter further.  *Id.*  Sonoran Vein never responded.  *Id.*

5         On November 6, 2024, Pima Heart saw that Dr. Leon was featured on Sonoran Vein's

6    website as a vascular surgeon, working out of its office at 1815 W. St. Mary's Rd., Tucson, AZ

7    (the "St. Mary's Location") and its office at 2055 W. Hospital Dr., Tucson, AZ (the "Hospital

8    Drive Location").  *Id.* ¶ 17.  The Hospital Drive Location is within five miles of Pima Heart's

9    River Road Location (and literally next door to another Pima Heart office), and the St. Mary's

10   Location is just 5.75 miles away from that location.  *Id.*  On November 13, 2024, Pima Heart sent

11   a letter to Sonoran Vein and Dr. Leon demanding that they cease and desist from violating the

12   Restrictive Covenants.  *Id.*  Sonoran Vein did not respond.

13        Instead, it filed a lawsuit with Dr. Leon against Pima Heart on November 20, 2024 in Pima

14   County Superior Court—in violation of the forum selection clause in Dr. Leon's Employment

15   Agreement (L. Andrews Decl. Ex. D § 11.6)—seeking to void the Restrictive Covenants on an

16   emergency basis.  The Pima Superior Court denied their request, and Pima Heart has moved to

17   dismiss the case given the forum selection clause.  L. Andrews Decl. Ex. F; K. Bird Decl. Ex. S.

18        In the course of the state court proceedings, Dr. Leon and Sonoran Vein have claimed that

19   Sonoran Vein has not yet hired Dr. Leon in Pima County.  *See* Bird. Decl. Ex. R ¶¶ 91-92.  But

20   just as Ms. Bailey lied about leaving Pima Heart to teach, Dr. Leon and Sonoran Vein lied about

21   Dr. Leon not working in Pima County.  An investigator has observed Dr. Leon's vehicles parked

22   in the "physicians" area in the parking lot of the St. Mary's Location in Pima County ***every time***

23   he visited to see if Dr. Leon was there in December—which reflect seven separate times,

24   including in the morning and the afternoon.  R. Downer Decl. ¶¶ 2, 5–11.  On one occasion, the

25   investigator saw Dr. Leon leave his car and enter the building wearing scrubs.  *Id.* ¶ 8.  Dr. Leon

26   is thus currently working at Sonoran Vein's locations in Pima County, in violation of his non-

27   compete, and so are Ms. Bailey and Ms. Clark, who are still in possession of the reams of Pima

28   Heart trade secrets they stole.

1

**ARGUMENT**

2      The Court should grant a TRO and preliminary injunction where the plaintiff demonstrates

3  that (i) it is likely to succeed on the merits, or serious questions going to the merits exist; (ii) it is

4  likely to suffer irreparable harm in the absence of preliminary relief; (iii) the balance of equities

5  tips in its favor; and (iv) an injunction is in the public interest.  *See, e.g., Stuhlbarg Int'l Sales*

6  *Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (analysis for TRO

7  and preliminary injunction is "substantially identical"); *Colwell Consulting LLC v. Papageorge*,

8  2024 WL 3811677, at *10 (D. Ariz. Aug. 14, 2024) (granting TRO in trade secret case); *Bullock*

9  *v. Ariz. Bd. of Regents*, 2024 WL 4680575, at *3 (D. Ariz. Nov. 5, 2024) (granting TRO; "in the

10  Ninth Circuit, a temporary restraining order is also warranted where 'serious questions going to

11  the merits' exist").  Each factor supports entering a TRO here.

12  **I.     PIMA HEART IS LIKELY TO SUCCEED ON THE MERITS**

13        **A.     Pima Heart Is Likely To Succeed On Its Trade Secrets Claim**

14        Each element of Pima Heart's trade secret claim is established:  Pima Heart has valuable

15  trade secrets that Defendants misappropriated, causing actual or threatened harm.  *See Colwell*

16  *Consulting LLC v. Papageorge*, 2024 WL 3811677, at *8-9 (D. Ariz. Aug. 14, 2024).

17        ***First***, the materials that Defendants stole—summarized above and described in more

18  detail in the accompanying declarations—constitute trade secrets.  A "trade secret" is information

19  that derives independent economic value, actual or potential, from not being generally known to

20  the public or to other persons who can obtain economic value from its disclosure or use and is

21  the subject of reasonable efforts to maintain secrecy.  *See* 18 U.S.C.A. § 1839(3); *see, e.g.,*

22  *Colwell Consulting*, 2024 WL 3811677, at *8 ("information, data, calculations, formulas,

23  literature reviews, work product, expert reports, and presentations" constitute trade secrets;

24  rejecting argument that these categories are not "specific" enough).

25        Patient lists, for instance, are akin to customer lists that courts routinely find to be

26  protectable trade secrets.  *See, e.g., Gordon Grado M.D., Inc. v. Phx. Cancer & Blood Disorder*

27  *Treatment Inst. PLLC*, 603 F. Supp. 3d 799, 810 (D. Ariz. 2022) (plaintiffs sufficiently pled trade

28  secret claim when defendants instructed employees to "access proprietary systems and download

-9-

1  patient information"); *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016)

2  (finding likelihood of success on TRO; "Customer information such as sales history and customer

3  needs and preferences constitute trade secrets.").

4      Likewise, Pima Heart's profitability report, including its vendor pricing and other financial

5  information, is a trade secret. *See Enter Leasing Co. v. Ehmke*, 197 Ariz. 144, 150 (Ct. App.

6  1999) (financial information qualifies as trade secret when it would "provide a competitor with a

7  blueprint of the [business'] customer-service principles" and could affect a competitor's "pricing

8  and sale decisions" under the AUTSA);[2] *Food Servs. of Am., Inc. v. Carrington*, 2013 WL

9  4507593, at *6, *10 (D. Ariz. Aug. 23, 2013) (finding "compilations of data regarding operators,

10  suppliers, products, and pricing" protectable trade secret under AUTSA; crediting plaintiff's

11  affidavit that "the mix of customer, supplier, and product information has been refined over

12  decades to create our successful business offering in a highly competitive industry").  The same

13  is true of Pima Heart's checklists, strategy documents, protocols, and standard operating

14  procedures. *See Tracer Research Corp. v. Nat'l Envtl. Serv. Co.*, 843 F. Supp. 568, 578 (D. Ariz.

15  1993) (Marquez, J.) (granting PI; finding "process," "third-party performance evaluation," and

16  "Standard Operating Procedures Manual" to be protectable trade secrets, and "copying" them is

17  misappropriation); *W.L. Gore & Assocs., Inc. v. GI Dynamics, Inc.*, 2010 WL 5184254, at *8 (D.

18  Ariz. Dec. 15, 2010) (finding "research, development, and market opportunities," "methods and

19  prototypes" to be valid trade secrets); *Ehmke*, 197 Ariz. at 150 ("Worksheet reflects a substantial

20  market-research investment by Enterprise delineating several factors helpful to managing a

21  successful branch office" and is thus protectable trade secret).

22      All of the trade secrets at issue here, as detailed in the supporting Declarations, derive value

23  from not being known to Pima Heart's competitors, and Pima Heart has taken reasonable measures

24  to protect the secrecy of all foregoing materials.  *See supra* at 3; *Carrington*, 2013 WL 4507593

25  at *7 (D. Ariz. Aug. 23, 2013) ("Reasonable efforts do not require extreme and unduly expensive

26  procedures."); *Auto Now Fin. Servs. v. Abdeljaber*, 2013 WL 12106927, at *2 (D. Ariz. May 23,

27
28  ---
    [2] Authorities under the Arizona Uniform Trade Secrets Act ("AUTSA") are instructive because it is for all relevant purposes the same as DTSA.  *See Gordon Grado M.D., Inc. v. Phx. Cancer & Blood Disorder Treatment Inst. PLLC*, 603 F. Supp. 3d 799, 812 (D. Ariz. 2022).

-10-

2013) (reasonable measures included "making sure computers and servers at their place of business were password protected . . . [and having] privacy policies and procedures").

**Second**, even without the benefit of discovery, digital forensic evidence shows Defendants' misappropriation. *See JTH Tax LLC v. Anderson*, 2023 WL 3499645, at *4 (D. Ariz. Apr. 18, 2023) (misappropriation includes acquisition, disclosure, or use by improper means). Defendants misappropriated Pima Heart's trade secrets through improper means including theft, misrepresentation, and inducement of breach of duty. *Id.* (discussing "improper means"). Ms. Bailey's and Ms. Clark's coordinated and surreptitious downloading of trade secret material on their way out the door (*see supra* at 7) is quintessential misappropriation. *See, e.g., Henry Schein*, 191 F. Supp. 3d at 1077 (N.D. Cal. 2016) (finding likelihood of success under DTSA: "Defendant e-mailed and downloaded, to her personal devices, confidential information from [employer] before leaving her employment to work at a competitor); *Comet Techs. United States of Am. Inc. v. Beuerman*, 2018 WL 1990226, at *4 (N.D. Cal. Mar. 15, 2018) (same).

The surrounding circumstances indicate misappropriation too. *See Joshua David Mellberg LLC v. Will*, 2016 U.S. Dist. LEXIS 32414, at *16 (D. Ariz. Mar. 11, 2016) ("[P]laintiff in a trade secret case may rely on circumstantial evidence to prove misappropriation of trade secrets."). For instance, the fact that one of the folders Ms. Bailey created on her external USB storage drive was called "Personal" suggests that the numerous other folders she created—which names correspond to Pima Heart's trade secret material—*were not* personal material. Likewise, Defendants' duplicity regarding their intentions for work after leaving Pima Heart (Ms. Bailey saying falsely she would be teaching full time, and Dr. Leon claiming falsely that he is not yet working in Sonoran Vein's Pima County location), and their concealment of their theft during the Pima Heart exit interview process are other hallmarks of misappropriation. In light of Defendants' "lack of forthrightness," their "willingness to misuse [Pima Heart's] trade secrets" to benefit their new practices at Sonoran Vein is unmistakable, and Defendants "[can]not be trusted to act with the necessary sensitivity and good faith under the circumstances." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1270 (7th Cir. 1995) (affirming misappropriation finding under analogous Illinois Uniform Trade Secret Act).

Moreover, even though Ms. Bailey and Ms. Clark are the ones who actually downloaded Pima Heart's trade secrets, it is clear they did so for Dr. Leon's and Sonoran Vein's benefit. As a Physician Assistant and a Registered Nurse, Ms. Bailey and Ms. Clark would not have any other use for the material they stole, and they immediately took it to join Dr. Leon and Sonoran Vein. *See Gordon Grado M.D.*, 603 F. Supp. 3d at 810 (that defendant "instructed Plaintiff's former employees to access proprietary systems and download patient information" showed misappropriation); *JTH Tax LLC*, 2023 WL 3499645, at \*4 (defendants' "close relationship" with parties who misappropriated trade secrets establishes liability under improper use theory); *Elko, Inc. v. WTH Commer. Servs., LLC*, 2023 WL 6141623, at \*5 (D. Nev. Sept. 20, 2023) (party "need not provide a complete step-by-step explanation for how [new employer defendant] instructed [employee defendant] to steal confidential information in order to support a reasonable inference that it directed that acquisition").

***Third,*** Defendants' ongoing improper access to Pima Heart's trade secrets has already harmed Pima Heart, and threatens further harm because it gives Defendants the opportunity to make further use of Pima Heart's trade secrets at any time. Sonoran Vein's actual use of Pima Heart's trade secrets is highly likely—and unnecessary to show harm in any event. *See Paul Johnson Drywall Inc. v. Sterling Grp., LP*, 2021 WL 5882628, at \*5 (D. Ariz. Dec. 13, 2021) (harm to owner of trade secrets is inherent in improper acquisition or disclosure and does not require proof of actual use). Absent a TRO and preliminary injunction, Defendants' access to Pima Heart's trade secrets will give Sonoran Vein "an unearned advantage in competition against [Pima Heart] resulting in lost profits and, potentially, goodwill with clients." *Colwell*, 2024 WL 3811677, at \*9 (granting TRO); *Auto Now Fin. Servs. v. Abdeljaber*, 2013 WL 12106927, at \*3 (granting TRO to prevent "the potential [for defendant] to continue to take Plaintiff's customers" by misappropriating the customer list).

**B.** <u>**Pima Heart Is Likely To Succeed On Its Contract Claims**</u>

Pima Heart is also likely to prevail on its contract claims, based on both the theft of Pima Heart's confidential information and Dr. Leon's breaches of the Restrictive Covenants.

### (a)   *Dr. Leon and Ms. Bailey Breached Confidentiality Agreements*

In the days leading up to their departure from Pima Heart, Ms. Bailey and Ms. Clark downloaded vast swaths of Pima Heart's confidential information for the benefit of Dr. Leon and the new vascular surgery practice that Dr. Leon is starting at Sonoran Vein. This is a clear breach of Dr. Leon's confidentiality obligations to Pima Heart, as reflected in his Employment Agreement and Restrictive Covenant Agreement prohibiting his *use* of Pima Heart's confidential information for his own benefit or a third party's benefit—even assuming he did not steal the files himself. *See* Restrictive Covenant Agreement § 2 (preventing use of Pima Heart's confidential information "for [Dr. Leon's] own benefit or purposes, or the benefit or purposes of any other Person"); Employment Agreement § 7.2 (similar). In any event, the reasonable inference is that Ms. Bailey's and Ms. Clark's misconduct was undertaken on behalf of or with the authorization of Dr. Leon, so that the stolen information could then be transmitted to Dr. Leon and Sonoran Vein. This establishes Dr. Leon's breach of his confidentiality obligations.

This conduct also breached Pima Heart's Employment Handbooks and Health Information Confidentiality Statement, to which Ms. Bailey agreed. *See supra* at 5. These agreements are enforceable. *See, e.g.*, *Carrington*, 2013 WL 4507593 at *7 (D. Ariz. Aug. 23, 2013) (confidentiality provision in employee handbook is reasonable measure to protect secrecy).

### (b)   *Dr. Leon Breached His Restrictive Covenants*

Dr. Leon also breached his Restrictive Covenants, including his non-compete obligations which are in place through December 2026.

Critically, these obligations are subject to relaxed scrutiny because they were incidental to a sale of business. *See Gann v. Morris*, 122 Ariz. 517, 519 (Ariz. Ct. App. 1979) (Arizona law distinguishes between "covenants incidental to employment contracts and those incidental to sales of businesses because the policy considerations necessarily differ. . . . Courts have shown greater reluctance to interfere where the contract involves the sale of a business."). Here, Dr. Leon agreed to the Restrictive Covenants as part of a Transaction in which Pima Heart sold its business to USHV for ███████, and Dr. Leon personally received more than ███████ in consideration of the Restrictive Covenants. *See supra* at 4. Dr. Leon cannot accept such a large

1   payment in consideration for Restrictive Covenants and then flout those covenants. *Gann*, 122

2   Ariz. at 519 (when a business sale involves "clientele and a reputation in a specialized business

3   area," it "necessarily includes the sale of good will"); *Cont'l Promotion Grp., Inc. v. Garvin*,

4   2008 WL 11338887, at *10 (D. Ariz. May 8, 2008) (upholding 3-year worldwide non-compete

5   as a "mechanism" to safeguard "transfer of that goodwill" in sale of business). The involvement

6   of medical professionals does not alter the analysis. *See C21FC LLC v. NYC Vision Cap. Inc.*,

7   2022 WL 2191934, at *6 (D. Ariz. June 17, 2022) (finding sale of business standard applicable

8   in cases involving medical professionals);[3] *Ternlund v. Medical Anesthesia Consultants Med.*

9   *Group*, 2021 Cal. Super. LEXIS 153961, *7 (San Francisco Super. Ct. June 29, 2021) (doctor did

10  not show likelihood of prevailing on his claim to void non-compete entered in connection with

11  sale of business); *W. Coast Cambridge, Inc. v. Rice*, 584 S.E.2d 696, 698–99 (Ga. App. 2003)

12  ("[W]e are presented with restrictive covenants executed by [physician] in connection with a

13  transaction in which he received, and continues to receive, significant monetary consideration for

14  what he characterized as the sale of a portion of his ownership in Associates. The transaction is

15  comparable to the sale of a business and should be treated as such.").

16      The *Farber* case on which Defendants relied in the state court case is not to the contrary.

17  *Valley Med. Specialists v. Farber*, 194 Ariz. 363 (Ariz. Ct. App. 1999). In fact, it provides that

18  the sale of business standard is applicable to restrictive covenants binding medical professionals:

19      We first address the level of scrutiny that should be afforded to this restrictive
        covenant. Dr. Farber argues that this contract is simply an employer-employee
20      agreement and thus the restrictive covenant should be strictly construed against the
        employer…. VMS contends that this is more akin to the sale of a business; thus,
21      the noncompete provision should not be strictly construed against it….

22      Although this agreement is between partners, it is more analogous to an employer-
        employee agreement than a sale of a business. . . . ***When a business is sold, the***
23      ***value of that business's goodwill usually figures significantly into the purchase***
        ***price. The buyer therefore deserves some protection from competition from the***
24      ***former owner. A restraint accompanying the sale of a business is necessary for***
        ***the buyer to get the full goodwill value for which it has paid***.
25

26

27  [3]  *NYC Vision Capital* ultimately did not enforce the non-compete restrictions there because,
    unlike here, the parties' agreement including the non-compete provision had been rescinded.
28  2022 WL 2191934, at *6.

*Id.* at 368 (emphasis added).  *Farber* proceeded to invalidate the covenant under strict scrutiny, but as the above discussion makes clear, it did so only because the case did not involve a transfer of goodwill in the sale of a business.

Nor does it matter that Dr. Leon did not own equity in Pima Heart before the Transaction. What matters is that he was paid—handsomely so—to secure the transfer of his goodwill to the new owners, agreeing not to jump ship and compete against Pima Heart for a reasonable period after the Transaction.  *See, e.g.*, *Whinery v. Premier Funeral Mgmt. Grp. IV, LLC*, 2022 WL 4473716, at \*5 (W.D. Okla. Sep. 26, 2022) (rejecting argument that "an individual must own a legal interest in the assets of a corporation to have a sufficient interest in the goodwill of the corporation's business to support a noncompetition agreement executed in connection with the sale"); *Howard v. United States*, 448 F. App'x 752, 753 (9th Cir. 2011) (goodwill belonged to practice not to dentist; "The professional may [] transfer his or her goodwill to the practice by entering into an employment contract or covenant not to compete with the business.").  Under the governing relaxed standard of review, the Restrictive Covenants are easily enforceable.

Indeed, even if the Restrictive Covenants were not incidental to the sale of a business, they would still be enforceable under the stricter standard of review.  Arizona courts uphold a restrictive covenant "which is not unreasonable in its limitations . . . in the absence of a showing of bad faith or of contravening public policy." *Lassen v. Benton*, 86 Ariz. 323 at 328, *modified on reh'g*, 87 Ariz. 72 (Ariz. 1959).  The Restrictive Covenants meet this standard.

*First*, the Restrictive Covenants are reasonable in time duration, especially considering that the remaining effective duration under both agreements is at most two years.  *See, e.g.*, *Shufeldt*, 2016 WL 6647740, \*4-\*5 (18-month non-compete reasonable as enforced against a doctor); *Lassen,* 86 Ariz. at 328 (5-year restriction reasonable as enforced against a veterinarian).

*Second*, the Restrictive Covenants are reasonable in geographic scope.  The Restrictive Covenants are limited to the types of vascular surgery, cardiology, and ancillary services that Pima Heart provides.  *See supra* 4-5.  They do not restrict Dr. Leon from providing emergency medical services, nor services to patients admitted to a hospital on an impatient basis even within the restricted area, and Arizona courts have upheld geographic restrictions that are similar or larger

-15-

than those here with similar exceptions. *See id.* at \*5 (finding a 25-mile radius to be reasonable); *Lassen*, 86 Ariz. at 328 (finding a 12-mile radius to be reasonable).

*Third*, enforcing the Restrictive Covenants does not violate public policy. Arizona law recognizes that there is public interest in "free choice of doctors," *Farber*, 194 Ariz. at 368, but there are also "interests in protecting "proprietary information, business operations, and contractual rights." *See, e.g.*, *Diazteca Co. v. Palenque Foods Int'l LLC*, 2016 Ariz. Super. LEXIS 1509, at \*11 (Pima Cnty. Super. Ct. Nov. 14, 2016) (enforcing covenants: "public interest is served by protecting a company's right to proprietary information, business operations, and contractual rights"). Here, enforcing the Restrictive Covenants protects Pima Heart's bargained-for contractual rights, safeguarding its trade secrets, and protects it from unfair competition. *See Highway Techs., Inc. v. Porter*, 2009 WL 1835114, at \*4 (D. Ariz. June 26, 2009) ("This Court has recognized [] that enforcement of restrictive covenants is consistent with the public policy of protecting a company's interest in its customer base from unfair competition[.]"). Moreover, the public interest in favor of patients' choice of and access to doctors is not materially impacted here because the Restrictive Covenants do not restrict Dr. Leon from providing emergency medical services, nor services to patients admitted to a hospital on an impatient basis even within the restricted area. *See Shufeldt*, 2016 WL 6647740, at \*4-5 (these exceptions diminished "many of the concerns [] about protecting the doctor-patient relationship").

Dr. Leon's breaches of the Restrictive Covenants are also clear. His employment with Sonoran Vein in Pima County plainly violates his non-compete obligations, which bar him from competing within Pima County until December 6, 2026 pursuant to the Restrictive Covenant Agreement, or competing within a five-mile radius from Pima Heart's River Road Location and Green Valley Location until August 6, 2025 pursuant to the Employment Agreement. Dr. Leon also breached his non-solicitation obligations by enlisting Ms. Clark and Ms. Bailey to leave Pima Heart with him (and take its confidential information on their way out the door). Further, Dr. Leon has breached his obligation not to interfere with Pima Heart's business relationships by attempting to divert Tohono's business from Pima Heart to Dr. Leon's new employer. *See supra*

at 6-7. All of these breaches are actionable. *See Physical Excellence v. Dow*, 2006 WL 8441227, at \*5 (D. Ariz. Mar. 6, 2006) (interference and solicitation could be breaches of non-compete).

**C.    Pima Heart Is Likely To Succeed On Its Breach Of Loyalty Claim**

In Arizona, "an employee owes his or her employer a fiduciary duty, which includes a duty of loyalty." *Universal Servs. of Am. LP v. Mazzon*, 2023 WL 4031965, at \*6 (D. Ariz. June 15, 2023). "As a corollary of this duty," the employee may not use property of the employer for its own purpose, including by constructing a scheme in direct competition against the employer. *Id.* (use of company laptop to prepare to compete with employer would violate duty of loyalty). Nor may an employee solicit other employees for the benefit of a competitor. *Sec. Title Agency, Inc. v. Pope*, 219 Ariz. 480, 493 (App. 2008) ("encouraging or inducing" employees to "join a competing company" violated duty of loyalty). Dr. Leon and Ms. Bailey breached their duty of loyalty on both fronts.

While still employed at Pima Heart, Dr. Leon solicited Ms. Bailey, and likely Ms. Clark, to leave Pima Heart and join him at a competitor, having them improperly download Pima Heart's trade secrets for use in their new enterprise. They also interfered with Pima Heart's relationship with a prospective partner—Tohono—attempting to induce it to work with a competitor instead of Pima Heart while they were still employed by Pima Heart. This course of conduct was a clear breach of the duty of loyalty. *Mazzon*, 2023 WL 4031965 at \*6; *Bancroft-Whitney Co. v. Glen*, 64 Cal. 2d 327, 347 (1966).

**D.    Pima Heart Is Likely To Succeed On Its Tortious Interference Claim**

Pima Heart can establish every element of its tortious interference claim against Sonoran Vein as well: "(1) the existence of a valid contractual relationship; (2) knowledge of the relationship by [Sonoran Vein]; (3) intentional interference inducing or causing a breach; (4) resultant damage to [Pima Heart]; and (5) that [Sonoran Vein] acted improperly." *Mazzon*, 2023 WL 4031965, at \*5.

***First***, Pima Heart has valid contracts with Dr. Leon and Ms. Bailey. ***Second***, Sonoran Vein had knowledge of Dr. Leon's agreements, as evidenced by its claims in pre-litigation correspondence and its state court complaint that the agreements are supposedly void. *See*

-17-

L. Andrews Decl. Ex. E; K. Bird. Decl. Ex. R.[4] ***Third***, Sonoran Vein's knowledge of Dr. Leon's non-compete and non-solicit obligations while continuing to employ him is sufficient to show intentional interference (*see NCWC Inc. v. CarGuard Admin. Inc.*, 635 F. Supp. 3d 815, 824 (D. Ariz. 2022) (denying defendants' summary judgment on tortious interference claim; "a defendant may be held liable for intentional interference with a third-party contract containing a non-compete clause . . . by subsequently becoming aware of the non-compete provision and continuing its course of dealing")), as is its "access to and [awareness] of" Pima Heart's confidential information through Ms. Bailey, Ms. Clark, and Dr. Leon (*Mazzon*, 2023 WL 4031965, at *5). ***Fourth***, Pima Heart has suffered from and will continue to be damaged by Sonoran Vein's interference, including because Dr. Leon is now competing against Pima Heart, for the benefit of Sonoran Vein, in close proximity to Pima Heart. *See supra* at 7-8.

## II.    PIMA HEART IS BEING IRREPARABLY HARMED

Pima Heart will suffer irreparable harm without a TRO and preliminary injunction to maintain the status quo and protect its trade secrets from further misappropriation by its competitor. *See, e.g.*, L. Andrews Decl. ¶ 34.

***First***, "once a protectable interest is established, irreparable injury is ***presumed*** to follow if the interest is not protected." *Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 983 (D. Ariz. 2006) (granting preliminary injunction in restrictive covenant case); *Fitness v. C.P. Body Design*, 2010 WL 11628010, at *9 (D. Ariz. Feb. 24, 2010) (for violation of a non-compete, "irreparable injury is presumed to follow if the interest is not protected").

***Second***, in addition to the presumed harm, breaches of non-competes cause irreparable harm. *See Ajilon Pro. Staffing, LLC v. Griffin*, 2009 WL 976522, at *3 (D. Ariz. Apr. 10, 2009) (finding irreparable harm from breach of non-compete because of "loss of goodwill" and because "the effect of [employee's] local competition on existing and potential future clients of [former

---

[4] Sonoran Vein likely knew about Ms. Bailey's contract too, given her close relationship with Dr. Leon, the timing of their coordinated departure, their contemporaneous employment with Sonoran Vein, and the fact that they "work[ed] as a group to create and implement a plan." *Solar Optimum Inc. v. Elevation Solar LLC*, 2024 WL 1961858 (D. Ariz. May 3, 2024) (tortious interference sufficiently pled; rejecting defendants' argument that they lacked knowledge because they "work[ed] as a group to create and implement a plan to poach [employer's] employees and corporate data").

employer] cannot readily be quantified."). This risk is palpable here, where Dr. Leon agreed to Restrictive Covenants to safeguard Pima Heart's goodwill, and where he is nevertheless now competing against Pima Heart just 5 miles away from one of the top two Pima Heart locations he worked at before, and which is also **next door** to the nearest Pima Heart location. *See supra* at 8; L. Andrews Decl. ¶ 19. Such harm cannot be fully compensated with damages because the loss of "existing and potential future" patient relationships is irreparable. *Griffin*, 2009 WL 976522, at *2. Additionally, Defendants' misappropriation of Pima Heart's trade secrets constitutes irreparable harm. *See Auto Now Fin. Servs. v. Abdeljaber*, 2013 WL 12106927, at *3 (D. Ariz. May 23, 2013) ("Customer lists are a type of trade secret and misappropriation of trade secrets gives rise to the potential for irreparable harm."); *Henry Schein*, 191 F. Supp. 3d at 1077 (granting TRO on DTSA claims: "[e]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm"); *Paul Johnson Drywall*, 2021 WL 5882628, at *5 (harm to owner of trade secrets is inherent in misappropriation even absent actual use). Without injunctive relief, Pima Heart will suffer substantially from the exploitation of its trade secrets by a competitor. This is classic irreparable harm. *See Abdeljaber*, 2013 WL 12106927, at *3.

**Third**, Dr. Leon acknowledged that "any violation or threatened violation" of the Restrictive Covenants would constitute irreparable harm. *See* L. Andrews Decl. Ex. C § 10; *id.* Ex. D § 7.4. Courts give weight to such contractual provisions. *See Fitness v. C.P. Body Design*, , 2010 WL 11628010, at *9 (D. Ariz. Feb. 23, 2010) (granting TRO and finding irreparable harm in defendants' breach of non-compete in part because "Defendants acknowledged that they understood that any breach of the covenant not to compete would cause irreparable" in the parties' agreement); *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (recognizing such a provision "might arguably be viewed as an admission").

## III.    THE BALANCE OF HARDSHIPS SUPPORTS INJUNCTIVE RELIEF

"For the same reasons" that Pima Heart has established likelihood of success on the merits and the possibility of irreparable harm, "the balance of hardships tips sharply in [its] favor." *Alto v. Salazar*, 2011 U.S. Dist. LEXIS 114167, at *5 (S.D. Cal. Oct. 4, 2011). *Highway Techs., Inc.*

*v. Porter*, 2009 WL 1835114 (D. Ariz. June 26, 2009), is particularly instructive.  There, the district court found that the balance of hardships weighed in favor of enforcing restrictive covenants and issuing a TRO against the employees because:

> Jose and Porter specifically negotiated—and received substantial compensation for—the restrictive covenants . . . .  They terminated their employment with full knowledge of those covenants.  They told HT that they had not yet determined what they would be doing after their departure  . . .  but in fact they already had formed a competing business . . . .  Absent enforcement of the restrictive covenants, they will be free to compete directly against HT during a time, as they admit, when HT is vulnerable as a result of their departures.  Any personal hardship Defendants will suffer because of their decision to leave HT and breach their covenants is outweighed by the irreparable injury HT will suffer absent injunctive relief.

*Id.* at *4.  Here, each of the factors in *Highway* is present:  Dr. Leon received "substantial compensation" in exchange for the Restrictive Covenants, Defendants devised a secretive scheme to compete against Pima Heart months before their departure from Pima Heart, while lying to cover it up, and Defendants stole Pima Heart's trade secrets on their way out the door.  Any purported personal hardship is outweighed by the irreparable injury to Pima Heart absent injunctive relief.  Indeed, Defendants cannot claim hardship from being enjoined from doing that which they have no right to do in the first place—breaching contracts and misappropriating trade secrets.  *See, e.g.*, *Ajilon Prof'l Staffing, Ltd. Liab. Co. v. Griffin*, 2009 WL 976522, at *9 (D. Ariz. Apr. 10, 2009) ("[Employee signed the non-competition provision and cannot now complain of significant hardship given his voluntary departure from and competition with [former employer].");  *Dish Network L.L.C. v. Ramirez*, 2016 WL 3092184, at *7 (N.D. Cal. June 2, 2016) (balance of hardships favors plaintiff when the injunction "prevents only [] illegal conduct").

## IV.    PUBLIC INTERESTS SUPPORT INJUNCTIVE RELIEF

Granting a TRO and preliminary injunction here serves numerous public interests.  ***First***, "the public interest is served by protecting a company's right to proprietary information, business operations, and contractual rights."  *Compass Bank*, 430 F. Supp. 2d at 983.  ***Second***, enforcing restrictive covenants serves "the public policy of protecting a company's interest in its customer base from unfair competition."  *Id.*  ***Third***, the purpose underlying federal trade secret law is furthered by injunctive relief "against the wrongful appropriation of confidential information by an employee."  *Ehmke*, 197 Ariz. at 151; *Henry Schein*, 191 F. Supp. 3d at 1078 (similar).

**V.    PIMA HEART SHOULD NOT BE REQUIRED TO POST ANY BOND**

      This Court should dispense with the bond requirement pursuant to Fed. R. Civ. P. 65(c) because the relief Pima Heart is seeking "simply enjoin[s] Defendant from doing something Defendant never had a right to do in the first place." *Comet Techs. United States of Am. Inc. v. Beuerman*, 2018 WL 1990226, at *6 (N.D. Cal. Mar. 15, 2018).  As such, there can be "no realistic likelihood of harm" to Defendants because they have no right to violate Pima Heart's contractual rights and misappropriate Pima Heart's property in the first place. *See Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (a court may dispense with the filing of a bond when there is no realistic likelihood of harm to the defendant from enjoining his or her conduct).

**VI.    THE COURT SHOULD PERMIT EXPEDITED DISCOVERY**

      Finally, in addition to a TRO, expedited discovery is necessary so Pima Heart can learn the full scope of Defendants' misconduct prior to a preliminary injunction hearing, and to ensure that Pima Heart's trade secrets do not spread further.  R. Johnson Decl. ¶ 18.  Pima Heart has shown clear violations even without discovery, but access to Defendants' emails and testimony is necessary to many issues including how Defendants have used Pima Heart's trade secrets and how they are now competing against it.  Federal Rule of Civil Procedure 26(d) authorizes the Court to grant expedited discovery upon a showing of "good cause," and courts routinely find that "good cause" exists to permit expedited discovery in aid of preliminary injunction briefing. *See, e.g.*, *Bakemark USA LLC v. Pastis*, 2024 WL 149727, at *4 (D. Ariz. Jan. 12, 2024) ("Good cause exists for expedited discovery because a preliminary injunction hearing will be held [] and expedited discovery will ensure that evidence is not lost, destroyed, altered or deleted and the parties can present complete evidence to the Court at the hearing."); *WeRide Corp. v. Huang*, 379 F. Supp. 3d 834, 854 (N.D. Cal. 2019).  Pima Heart's requested discovery is narrowly tailored to the key disputed issues. K. Bird Decl. ¶ 4 & Ex. T.  Good cause exists to expedite this discovery.

**CONCLUSION**

     Pima Heart respectfully requests that the Court grant this motion in its entirety.

1  DATED this 23rd day of December, 2024.

2

3

4                                          By: _____

5

6                                          QUINN EMANUEL URQUHART &
                                           SULLIVAN, LLP
7                                          John B. Quinn
                                           Kristen Bird
8                                          B. Dylan Proctor
                                           Ryan Landes
9
                                           FENNEMORE CRAIG, P.C.
10                                         Amy Abdo
                                           Brett C. Gilmore
11                                         Lyndsey Maasch

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER, EXPEDITED DISCOVERY, AND OSC